IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BRADLEY REID WILDENBERG,

Plaintiff,

v.

KILOLO KIJAKAZI[1],
Acting Commissioner of Social Security,

Defendant.

OPINION AND ORDER

20-cv-297-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Bradley Reid Wildenberg seeks judicial review of a final decision of defendant, Commissioner of the Social Security Administration, finding plaintiff not disabled within the meaning of the Social Security Act. Plaintiff contends primarily that the administrative law judge (ALJ)'s evaluation of plaintiff was inadequate in the following respects: (1) failing to make a proper evaluation of plaintiff's subjective symptoms; (2) failing to thoroughly assess the medical opinions of plaintiff's treating providers and the state agency reviewing consultants; and (3) failing to adduce substantial evidence in support of her step five conclusion that plaintiff was able to perform other jobs existing in significant numbers in the national economy. After reviewing the record, I am not persuaded that any of the issues identified by plaintiff warrant remand. Therefore, the commissioner's decision will be affirmed.

---

[1]The court has changed the caption to reflect Kilolo Kijakazi's recent appointment as acting commissioner.

OPINION

On September 20, 2016, plaintiff filed applications for a period of disability insurance benefits and supplemental security income beginning on his alleged onset date of January 1, 2016 , when he was 39 years old. In an April 19, 2019 decision, ALJ Patricia Witkowski Supergan found that plaintiff was not disabled. AR 13-24. The ALJ determined that even though plaintiff suffered from the severe impairments of asthma, status post laminectomy, obesity, and depression, he had the residual functional capacity to perform a reduced range of light work. AR 16, 18. In particular, the ALJ found that plaintiff was limited to: occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; frequent balancing and stooping; and occasional kneeling, crawling, and crouching. AR 24. Plaintiff was also restricted to only occasional exposure to vibration, fumes, gases, or other pulmonary irritants, as well as hazards such as moving machinery or unprotected heights. Finally, the ALJ found plaintiff was also restricted to simple, routine tasks requiring no more than short, simple instructions and simple work-related decisions with few workplace changes. AR 18. In reaching her conclusions, the ALJ gave "great weight" to the opinions offered by the agency's medical and psychological consultants and "minimal weight" to opinions offered by Dr. Fleming, plaintiff's primary care physician, and Rachel Johnson, a nurse practitioner who changed plaintiff's intrathecal pain pump. AR 21-23. (According to Oxford Languages, an intrathecal injection is administered into the spinal "theca," which is the loose sheath enclosing the spinal cord.)

Relying on the testimony of a vocational expert, the ALJ found that plaintiff could still perform jobs in the national economy despite his limitations. AR 23-24. The Appeals Council denied plaintiff's appeal and plaintiff filed this appeal.

The case is now before this court to determine whether the ALJ's decision is supported by substantial evidence, that is, "sufficient evidence to support the agency's factual determinations." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). The threshold for sufficiency is not high; the substantial evidence standard requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. Moon v. Colvin, 763 F.3d 718, 721 (7th Cir. 2014).

Plaintiff challenges the ALJ's decision primarily on three grounds. He contends that the ALJ erred by failing to: (1) evaluate plaintiff's subjective symptoms properly; (2) evaluate properly the medical opinions from plaintiff's treating providers and the state agency consultants; and (3) adduce substantial evidence in support of her step five conclusion that plaintiff was able to perform other jobs existing in significant numbers in the national economy.

A. Subjective Symptoms

An ALJ's findings about a plaintiff's testimony and allegations regarding his symptoms are entitled to great deference, and should be upheld unless patently wrong. Summers v. Berryhill, 864 F.3d 523, 528 (7th Cir. 2017). An ALJ is only required to give

reasons sufficient to provide a fair sense of how the ALJ assessed plaintiff's testimony and statements. Social Security Ruling (SSR) 16-3p. Moreover, the ALJ does not need to explain why each of the claimant's statements deserved little weight. Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012). The court reads the decision as a whole to determine whether the ALJ adequately supported the subjective-symptom evaluation. Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2014). Not all of the ALJ's reasons have to be sound as long as enough of them are. Halsell v. Astrue, 357 Fed. Appx. 717, 722-723 (7th Cir. 2009).

In this case, the ALJ determined that plaintiff's subjective symptoms were "not entirely consistent with the medical evidence and other evidence in the record[.]" AR 21. In reaching this finding, the ALJ summarized plaintiff's allegations and discussed the objective medical evidence, including plaintiff's various statements to his health care providers about his pain and the providers' objective findings. AR 18-20. The ALJ also considered the various treatments plaintiff had undergone for his back pain since 2009, observing that since his alleged onset date, plaintiff's treatment had consisted mainly of medications delivered orally and through an intrathecal pain pump. AR 21. The ALJ also considered plaintiff's daily activities, noting that plaintiff had been able to work at various part time jobs, including pizza delivery and a jewelry store, and that he had obtained his real estate license and sold one house. AR 21. Finally, the ALJ considered all of the opinion evidence contained in the record. AR 21-23. Based on her review of the record, she concluded that plaintiff retained the ability to perform a limited range of light work.

Plaintiff first contends that the ALJ failed to give proper consideration to plaintiff's subjective symptoms, relying too heavily on plaintiff's part-time employment and failing to acknowledge that plaintiff required frequent rest breaks, reduced hours and duties and eventually was let go from or quit his jobs because of pain. See Lanigan v. Berryhill, 865 F.3d 558, 565 (7th Cir. 2017) (cautioning ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment); Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011) (explaining that a claimant's "brief, part-time employment" did not support a conclusion "that she was able to work a full-time job, week in and week out, given her limitations"); Larson v. Astrue, 615 F.3d 744, 752 (7th Cir. 2010) ("There is a significant difference between being able to work a few hours a week and having the capacity to work full time."); but see Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."). In this case, however, the ALJ did not conclude that plaintiff could work full-time because he had been able to work part time. To the contrary, she recognized that plaintiff's work activities "do not equate to working a 40 hour work week," but found nevertheless that they suggested that plaintiff was not "as limited as he alleges." AR 21.

Although plaintiff insists otherwise, I am not persuaded that the ALJ erred in drawing an adverse conclusion about the severity of plaintiff's symptoms from his part-time work activities. As the ALJ found, plaintiff's work activities suggested that he was not as limited as he alleged. Notably, the activities were inconsistent with his testimony that it was

necessary for him to lie down for 80 percent of his day. Moreover, plaintiff's part-time work was just one of a number of factors the ALJ considered in evaluating the credibility of his pain complaints. She also reviewed plaintiff's medical record, which showed that: (1) plaintiff had normal strength and reflexes on exam, and was often noted to rise easily, show no signs of apparent distress, and walk without a limp; (2) his providers noted he did not have any work restrictions but could work "per his tolerance"; and (3) his providers encouraged him to exercise and to expect a temporary increase in his pain as he increased his activity. See, e.g., AR 19-20; (record cites). As discussed further below, it was also reasonable for the ALJ to rely on the opinions of the state agency consultants that plaintiff was still capable of some types of full time work not withstanding his back pain. Taking all of the evidence into consideration, I cannot say that it was patently wrong for the ALJ to conclude that plaintiff's part time work activities showed that he was able to tolerate more activities than he claimed at the hearing.

Plaintiff further criticizes the ALJ for finding that plaintiff's treatment had been "minimal with medications and the pain pump," AR 21, arguing that the ALJ failed to consider all of the treatment that plaintiff underwent for his back pain before his alleged onset date, which included a lumbar fusion with subsequent removal of L5 screw and rod replacement, joint blocks, various injections, radiofrequency ablation, oral medications, and finally, the pain pump. This argument is unpersuasive because the ALJ did discuss this evidence in her decision, devoting a full paragraph to summarizing plaintiff's pre-onset treatment history. AR 19. Nevertheless, the ALJ properly focused her analysis on the

medical evidence from the alleged onset date forward, which consisted mainly of periodic visits for medication management and the pain pump. In describing this treatment as "minimal," the ALJ plainly was not ignoring plaintiff's past treatment or his severe pain, but was simply contrasting plaintiff's more recent treatment with the more invasive treatments that he had undergone prior to his alleged onset date. However, as the ALJ properly recognized, the primary question before her was whether plaintiff had the ability to perform some types of work on a full time basis—in spite of his pain— from the alleged onset date forward. See Prochaska v. Barnhart, 454 F.3d 731, 737 (7th Cir. 2006) ("[C]ontrollable conditions do not entitle one to benefits.") (internal quotation marks and citation omitted). Plaintiff's past treatment was largely irrelevant to that question.

Plaintiff disputes the ALJ's ultimate conclusion that "overall it appears that the morphine pump helps with his symptoms," AR 21, pointing to various office visit notes in the record at which plaintiff reported having pain in spite of his pump, moving stiffly, or requiring medication increases. AR 928, 1112, 1114, 1165, 1171, 1178, 1181. However, the ALJ discussed all of these visits in her opinion, noting that at times plaintiff's gait was described as stiff, AR 19, 20, that he lay flat on the exam table during one visit, AR 20, and that he reported in September 2018 that he thought his back pain was worsening. AR 20. As the ALJ also noted, however, other visit notes suggested that the morphine pump did have some benefit: in January 2016, plaintiff reported that he had become more active socially and recreationally, AR 19 (citing AR 938); in March 2016 he was looking for jobs, AR 19 (citing AR 934); in January 2017, he reported feeling better and was encouraged to do daily

exercise and core strengthening, AR 19 (citing AR 1131); in March 2017, he appeared well and reported being excited about selling his first home as a real estate agent, AR 19 (citing AR 1187); and in August 2017, he appeared well, was talkative and pleasant, rose with ease, walked normally, and had started a new real estate job and was considering a part-time job driving. AR 19 (citing AR 1181). It is true that the treatment records show that plaintiff continued to struggle with pain, but the ALJ did not find otherwise or suggest that plaintiff was pain-free. She merely found that "overall it appears that the morphine pump helps" with plaintiff's symptoms, a conclusion that has substantial evidentiary support in the record.

Finally, plaintiff takes issue with the ALJ's conclusion that plaintiff's mental health treatment was "minimal." AR 21. He does not challenge the accuracy of this finding, conceding that he never sought emergency care for mental health reasons, does not regularly see a mental health professional, and that his prescribed medication for his mental health symptoms is helpful. Br. in Supp., dkt. #30, at 17. Instead, plaintiff seems to argue that the ALJ erred by failing to consider a June 2017 Behavioral Health evaluation with Dr. Cain, who diagnosed major depressive disorder, recurrent episode, moderate. However, the ALJ discussed this evaluation in her decision, noting Dr. Cain's mental health status examination and her diagnosis of plaintiff. AR 20. As the ALJ noted, plaintiff was to see Dr. Cain biweekly for psychotherapy to prepare him to join a pain coping skills group, but plaintiff did not follow through, later reporting to another provider that he had not felt a connection with Dr. Cain. AR 20 (citing AR 1181). Plaintiff was to see another mental health provider,

but as of August 2017, he had missed his first appointment with her. Id. Contrary to plaintiff's suggestion, then, the ALJ did not ignore any major "lines of evidence" concerning plaintiff's mental health treatment. To the contrary, she discussed all of the important evidence in her decision and reasonably determined that plaintiff's sporadic and minimal treatment for his mental health symptoms undermined any suggestion that those symptoms were disabling.

Ultimately, plaintiff mostly contests the manner in which the ALJ weighed the evidence. Wolfgram v. Berryhill, 2020 WL 433994, at *17 (E.D. Wis. Jan. 27, 2020). However, it is not the court's role to re-weigh the evidence, resolve conflicts or decide questions related to credibility. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008) ("When assessing an ALJ's credibility determination, we do not . . . undertake a de novo review of the medical evidence that was presented to the ALJ. Instead, we merely examine whether the ALJ's determination was reasoned and supported."); Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003). The fact that a different fact-finder could have weighed the evidence differently does not make the decision patently wrong. Schloesser v. Berryhill, 870 F.3d 712, 717 (7th Cir. 2017); Kolar v. Berryhill, 695 Fed. Appx. 161, 162 (7th Cir. 2017) ("Almost any conclusion an ALJ reaches in such situations may be inconsistent with some evidence in the record and consistent with other evidence.").

For all of the above reasons, I find that the ALJ's assessment of plaintiff's subjective complaints is thorough and generally well reasoned and that none of the issues cited by plaintiff warrants remand.

B. Medical Opinions

Dr. Pat Chan reviewed plaintiff's disability application at the initial level, concluding that plaintiff was capable of performing light work except that he could stoop only occasionally and should avoid exposure to fumes and poor ventilation. AR 109-11. Dr. Stephanie Green reviewed plaintiff's claim on reconsideration, agreeing with most but not all of Dr. Chan's conclusions. Whereas Dr. Chan had found plaintiff could stand or walk six hours in an eight-hour day, Dr. Greene found that plaintiff could stand or walk only four hours in an eight-hour day. In addition, it was Dr. Greene's opinion that plaintiff had more postural limitations than Dr. Chan had suggested. AR 128-29.

Because plaintiff alleged depression, his claim was also reviewed by state agency psychological consultants. At the initial stage, Frank Orosz, Ph.D, wrote that although plaintiff had "moderate" limitations in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods, those limitations would not prevent plaintiff from carrying out 2-3 step instructions or from maintaining his attention and concentration for up to 2 hours at a time. AR 111-12. Lisa Fitzpatrick, Psy.D., agreed with this assessment on reconsideration. AR 192-31. Both Orosz and Fitzpatrick found that, although plaintiff had some mental symptoms, they did not prevent him from performing simple, routine work tasks. AR 131.

Plaintiff's primary care physician, Dr. Fleming, completed a residual functional capacity questionnaire for plaintiff in October 2018. AR 1212-15. Dr. Fleming wrote that she had treated plaintiff since January 2016. She found that plaintiff could lift no more than

10 pounds occasionally, sit and stand or walk less than 2 hours in an 8-hour workday, required frequent opportunities to walk around or lie down during the day, would likely be absent more than three days a month, and was extremely limited in the ability to deal with normal work stress. Dr. Fleming wrote that any improvement in plaintiff's symptoms was "incredibly unlikely" because plaintiff had pursued all the treatment options available to him. AR 1215. Rachel Johnson, a nurse practitioner who changed plaintiff's pain pump, offered similar opinions about plaintiff's abilities on a residual functional capacity questionnaire in November 2018. AR 1248-1250.

The ALJ determined that plaintiff could perform light work with various postural and environmental restrictions, and that he was further capable of performing simple routine tasks requiring no more than short, simple instructions and simple work-related decision making with few workplace changes. AR 18. In arriving at this conclusion, the ALJ gave "great weight" to the opinions offered by the agency's medical and psychological consultants and "minimal weight" to the opinions offered by Dr. Fleming and nurse practitioner Johnson. AR 21-23.

Plaintiff argues that the ALJ's analysis of the opinion evidence is flawed in several respects. First, he complains that the ALJ did not explain why she adopted Dr. Chan's finding that plaintiff could perform light work rather than Dr. Greene's conclusion that plaintiff could stand and walk only four hours a day, a limitation that plaintiff claims would limit him to sedentary work. Even assuming that this was error, however, plaintiff fails to develop any persuasive argument as to how this undercut his claim. As the commissioner

notes, neither Dr. Greene nor Dr. Chan found that plaintiff had limitations that would preclude him from all work, and plaintiff makes no attempt to show how a limitation to standing or walking four hours a day would have kept him from performing the jobs identified by the vocational expert at step five of the sequential evaluation process. Absent some showing by plaintiff that adopting Dr. Greene's four-hour standing/walking limitation would have made any difference to the outcome of his application, I must conclude the error is harmless. See Butler v. Kijakazi, 4 F.4th 498, 504 (7th Cir. 2021) (remand not required where plaintiff alleges merely "pro forma error"); McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011) (remand for further specification not required where court is convinced that ALJ will reach same result).

Plaintiff takes the same approach with respect to the opinions of the state agency psychological consultants, arguing that the ALJ adopted a less restrictive RFC than the consultants did without explaining why. Although plaintiff's argument is hard to follow, he seems to be making the argument that the ALJ was required to include in her RFC the state agency consultants' conclusion that, although plaintiff was able to maintain attention and concentration for up to two hours at a time, he had "some difficulty" for longer periods of uninterrupted work. See AR 145. Once again, however, plaintiff does not attempt to show that any of the jobs cited by the vocational expert – parking meter collector, small product assembler, or collator operator – require sustained concentration for more than two hours at a time. Moreover, both consultants found that plaintiff retained the residual functional capacity to perform simple, routine work tasks in spite of his difficulties with concentration

and attention, an opinion the ALJ reasonably relied upon in fashioning her own RFC. See Burmester v. Berryhill, 920 F.3d 507, 511 (7th Cir. 2019) (ALJ may reasonably rely upon the opinion of a medical expert who translates findings about plaintiff's limitations into an RFC determination).[2]

Plaintiff next argues that the ALJ erred in rejecting the restrictive opinion of Dr. Fleming, his treating primary physician. Under the treating physician rule in effect at the time of plaintiff's application, the ALJ had to give a treating physician's opinion controlling weight if it was "well-supported and not inconsistent with other substantial evidence." Stage v. Colvin, 812 F.3d 1121, 1126 (7th Cir. 2016); 20 C.F.R. § 404.1527(c)(2)-(6). If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ has to assign it a weight based on factors such as the length and nature of the physician-patient relationship, the opinion's consistency with the record and the physician's area of specialty. 20 C.F.R. § 404.1527(c)(2); Kaminski v. Berryhill, 894 F.3d 870, 875 (7th Cir. 2018). An ALJ who chooses not to credit a treating source's opinion must offer "good reasons" for not doing so. Stage, 812 F.3d at 1126; 20 C.F.R. § 404.1527(c).

Plaintiff does not argue that Dr. Fleming's opinion was entitled to controlling weight, but he argues that the ALJ failed to cite good reasons for giving it "minimal" weight. I disagree. The ALJ rejected Dr. Fleming's opinion because: (1) Dr. Fleming's limited

---

[2]For this same reason, I reject plaintiff's related argument that the ALJ's hypothetical to the vocational expert was flawed because it did not expressly include the state agency consultants' specific statements regarding plaintiff's ability to concentrate and pay attention. See Plt.'s Br., dkt. #30, at 22-24.

treatment notes lacked clinical findings to support the severe limitations she endorsed; and (2) her opinion that plaintiff had "extreme" limitations in the ability to deal with normal work stresses was inconsistent with plaintiff's ability to work at times. AR 22. Overall, the ALJ concluded, Dr. Fleming's opinion of plaintiff's limitations appeared to be "sympathetic."

These were good reasons for discounting Dr. Fleming's opinion. Although plaintiff cites various clinical records that he insists support Dr. Fleming's assessment of his limitations, many of these records simply restate plaintiff's subjective complaints and do not reflect any physical examination findings or other clinical evidence. As the ALJ noted, although plaintiff was observed to be stiff or limping at times, on other occasions he appeared well, was in no acute distress, did not limp and rose with ease. See AR 938, 1172, 1181. Indeed, Dr. Fleming's examination notes on the date she completed the residual functional capacity questionnaire noted only "tender to lumbar spine, [range of motion] limited" as objective support for her opinion. AR 1235. The ALJ also pointed out that, according to a December 2016 clinic note, plaintiff had no work restrictions *per se*, but was able to work per his tolerance, and in fact, *had* been able to tolerate at least some part time work, including obtaining his realtor's license and selling one house. AR 19 (citing AR 1115). So far as it appears, Dr. Fleming did not conduct any clinical assessment to determine plaintiff's limitations, but based her opinion on plaintiff's self-reports of his own work tolerance. The ALJ could reasonably discount Dr. Fleming's opinion and deem it "sympathetic" for this reason. Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (ALJ properly rejected opinion of treating physician that was "based almost entirely on

[plaintiff's] subjective complaints rather than objective evidence."). (The same holds true for the opinion of nurse practitioner Johnson's opinion, which the ALJ rejected for these same reasons.)

In sum, the ALJ properly applied the commissioner's rules for weighing medical opinions and cited substantial evidence in support of her decision to give more weight to the opinions of the state agency consultants than to those of Dr. Fleming and nurse practitioner Johnson. Accordingly, I must affirm the commissioner's decision in this regard.

C. Step Five Challenges

An individual is disabled only if he or she "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). The commissioner bears the burden of showing that there are a significant number of jobs that the claimant is capable of performing. See 20 C.F.R. § 404.1560(c)(2); Britton v. Astrue, 521 F.3d 799, 803 (7th Cir. 2008) (per curiam). The commissioner typically uses a vocational expert to assess whether there are a significant number of jobs in the national economy that the claimant can do. Lee v. Sullivan, 988 F.2d 789, 793 (7th Cir.1993).

In this case, the vocational expert testified that an individual with plaintiff's residual functional capacity could perform the jobs of: (1) parking meter collector, with approximately 65,000 jobs in the national economy; (2) small product assembler, with

approximately 17,000 jobs in the national economy; and (3) collator operator, with approximately 16,000 jobs in the national economy. AR 24, 60. (In addition, the expert identified the following sedentary jobs: (1) envelope addresser (22,000 jobs); (2) final assembler (15,000 jobs); and (3) stuffer (12,000 jobs).) Relying on the Dictionary of Occupational Titles, plaintiff argues that these jobs could not, in fact, be performed by an individual with his residual functional capacity.

In response, the commissioner first argues that plaintiff waived this argument by failing to raise any objections to the vocational expert's testimony at the administrative hearing. However, this argument overlooks the Seventh Circuit's decision in Overman v. Astrue, 546 F.3d 456 (7th Cir. 2008), in which the court held that if there appears to be an "obvious" conflict between the testimony of the vocational expert and the information provided in the Dictionary of Occupational Titles, the ALJ must ask the expert to reconcile the apparent conflict, even if the claimant does not object during the hearing. Id. at 463 (citing SSR 00-4p, at 5). A conflict is apparent if it is "so obvious that the ALJ should have picked up on [it] without any assistance." Weatherbee v. Astrue, 649 F.3d 565, 570 (7th Cir. 2011). In this case, the ALJ advised the vocational expert that, if he offered any opinions that conflicted with the Dictionary of Occupational Titles, then he needed to say so and provide the reason and basis for his opinion. AR 55. The expert did not identify any conflicts, and plaintiff's counsel did not point any out at the hearing.

However, plaintiff now contends that remand is required because the ALJ did not resolve "obvious" conflicts between the jobs identified by the vocational expert and plaintiff's

residual functional capacity assessment. First, he argues that it is plain that he cannot perform the parking meter collector job because, according to the Dictionary of Occupational Titles, that job is performed at the medium level of exertion. See DOT # 292.483-010. Contrary to the commissioner's argument, plaintiff does not merely rely on his own "lay characterization" of the job, but on the Dictionary definition, which specifies the job as requiring medium exertion. This seems like the sort of conflict that the ALJ should have picked up on, if not at the hearing, then before issuing her decision. Thus, plaintiff has shown an unexplained, obvious conflict between the vocational expert's testimony and the Dictionary of Occupational Titles with respect to the parking meter collector job.

The alleged conflicts with respect to the remaining two jobs, however, are not obvious. Plaintiff notes that the Dictionary of Occupational Titles describes one of the various tasks of a small products assembler as "load and unloads previously setup machines . . . to perform fastening, force fitting, or light metal-cutting operation on assembly line," DOT # 706.684-022, arguing that this task conflicts with plaintiff's RFC limitation that he have only occasional exposure to "hazards such as moving machinery." Similarly, he notes that the remaining job of collator operator "deals with moving machinery" insofar as it requires tending a "machine that assemble pages of printed material in numerical sequence." DOT # 208.685-010. However, the ALJ did not say that plaintiff could never work with or around machines, but only that he should not be exposed to "hazards *such as moving machinery*" more than occasionally. It is not apparent from the Dictionary descriptions cited by plaintiff whether the machines described are "moving" or otherwise "hazardous" such that

the jobs of small product assembler or collator operator would be precluded by plaintiff's residual functional capacity. Accordingly, this is not a conflict that the ALJ should have picked up on without assistance.

As a fallback, plaintiff argues that the total number of these jobs (33,000 nationally) is not significant. However, as I noted in a recent decision, although the Court of Appeals for the Seventh Circuit has not specified how many jobs amount to a "significant number," it has found that 55,000 jobs is a significant number. Craney v. Saul, Case No. 20-cv-558-bbc, dkt. # 21, 6/14/21 Opin. and Order at 5-6 (finding 27,700 jobs a significant number) (citing Collins v. Berryhill, 743 F. App'x 21, 25-26 (7th Cir. 2018) (55,000 jobs nationwide significant)). In addition, other courts have found fewer than 33,000 jobs to be a significant number. See, e.g., Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 528-29 (9th Cir. 2014) (25,000 nationwide jobs was significant); Taskila v. Comm'r of Soc. Sec., 819 F.3d 902, 905 (6th Cir. 2016) (6,000 nationwide jobs was significant); Dorothy B. v. Berryhill, No. 18 CV 50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 nationwide jobs was significant). See also Joseph M. v. Saul, No. 18 C 5182, 2019 WL 6918281, at *17 (N.D. Ill. Dec. 19, 2019) (40,000 nationwide jobs was significant). Thus, even without the parking meter collector jobs, the remaining 33,000 jobs (along with the 27,000 sedentary jobs of "final assembler" and "stuffer" that plaintiff appears to concede would be included, see Plt.'s Br., dkt. #30, at 27) constitute a significant number of jobs sufficient to meet the commissioner's burden at step five.

ORDER

IT IS ORDERED that the that the decision of defendant Kilolo Kijakazi, Acting Commissioner of Social Security, is AFFIRMED and plaintiff Bradley Reid Wildenberg's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 8th day of September, 2021.

BY THE COURT:

/s/

________________________

BARBARA B. CRABB
District Judge